**ECOLAB, INC., Plaintiff,**

v.

**K.P. LAUNDRY MACHINERY, INC., Kleen Pac Systems, Inc., Thomas P. Donnelly, and Albert J. Scocca, Defendants.**

No. 87 Civ. 0807 (PNL).

United States District Court,
S.D. New York.

March 10, 1987.

Dorsey & Whitney, New York City (James R. Kahn, Patricia C. Hayashi, Mark D. Arian, of counsel), for plaintiff.

Meyer & Meyer, Smithtown, N.Y., (Terence X. Mayer, Paul L. Dashefsky, of counsel), E. Thomas Boyle, Smithtown, N.Y., for defendants.

LEVAL, District Judge.

The plaintiff, Ecolab, Inc., moves for a preliminary injunction enjoining defendants Thomas Donnelly and Albert Scocca, who recently left employment at Ecolab, from contacting, soliciting, or accepting business from customers they serviced during their last year at Ecolab for a period of one year from the date they left Ecolab. The plaintiff also seeks to enjoin their new employers, the corporate defendants, K.P. Laundry Machinery, Inc., and Kleen Pac Systems, Inc., from soliciting or accepting business from Ecolab customers that were serviced by former Ecolab personnel now employed by the defendants. Plaintiff's asserted rights are founded primarily on employment agreements it had with its former employees—now employed by K.P. Laundry Machinery and Kleen Pac Systems—which contained limited covenants not to compete.

Ecolab is a Delaware corporation headquartered in Minnesota. Among other endeavors, it sells a variety of institutional cleaning supplies including detergents and sanitation products (hereinafter "chemicals") for warewashing and laundries. Kleen Pac Systems sells similar products. K.P. Laundry Machinery distributes industrial laundry equipment. Kleen Pac Systems and K.P. Laundry Machinery (hereinafter referred to collectively as "K.P.") are closely held New York corporations, apparently under common ownership and control.[1]

---

1. K.P. Laundry Machinery is owned by Brian Perry and Richard Kolosek. (Kolosek Dep. at 3–4.) There is some disagreement in the testimony as to who owns Kleen Pac Systems. Dominick Loguercio testified that he owns the company along with Perry and Kolosek. (D.

On February 6, 1987, the plaintiff applied for a temporary restraining order and preliminary injunction. Defendants declined to attend the conference. The application for the temporary restraining order was granted and a further conference was scheduled for February 10. The restraining order was served on February 9. (*See* Memorandum of February 10, 1987.) At the conference, after hearing from the defendants, the restraining order was continued. Intensive discovery was ordered to take place on an expedited schedule set by the court with the consent of the parties. It was ordered on consent that the hearing on the application for preliminary injunction would be upon a submitted record.

Upon the record of these submissions, the plaintiff has demonstrated that it is entitled to a preliminary injunction.

## Background

In June 1984, Ecolab and K.P. entered a distribution agreement. The agreement was oral and many of the terms are now in dispute. Nonetheless, the parties agree that under the agreement, K.P. purchased chemicals from Ecolab at a discount, warehoused those chemicals, and then resold them at approximately a forty-percent mark-up. The parties also agree that the distribution arrangement entailed a close working relationship between the companies. For example, Ecolab agreed to provide K.P. with leads for selling and servicing laundry equipment. In turn, K.P. agreed to introduce Ecolab chemicals into the laundries K.P. built and serviced. Ecolab supplied and installed the chemical dispensers at the laundries serviced and built by K.P.

On December 15, 1986, Ecolab terminated the distribution agreement, citing K.P.'s attempt to hire away a large number of Ecolab employees and to go into direct competition with Ecolab. Since December 15, seven employees have left Ecolab for K.P., six of whom currently remain with K.P. Between October 1986 and the present, K.P. has solicited at least nineteen Ecolab employees.

All Ecolab employees are required, as a condition of employment, to sign an employment agreement. Although the precise language differs somewhat from agreement to agreement, each contains a non-solicitation and a trade secrets provision. In substance, each employment agreement provides that for a period of one year after the employee's last day of work at Ecolab, he will not "contact, solicit, or accept any business ... from any customer of the Company whom the Employee contacted for the Company within the period of one (1) year prior to the termination of employment, nor will he assist any other person, firm, association or corporation to do so." (Pltf's Record at 1258.) The agreements also bar employees of Ecolab, as well as former employees, from disclosing "any trade secrets or confidential information relative to the Company's business." (Pltf's Record at 1258.)

Defendants Donnelly and Scocca and the other Ecolab employees hired by K.P. signed such agreements. Ecolab seeks enforcement of the terms of its employment agreements. K.P. contends that these agreements are unenforcable because they are against public policy, because the employees were coerced into signing, and because the agreements were not supported by consideration.

## Discussion

### 1. Breach of the Employment Agreement

The evidence forcefully supports the plaintiff's claim that Donnelly and Scocca have breached their employment agreements. Immediatley after joining K.P., both Donnelly and Scocca sent letters to their former clients. Although ostensibly sent as goodbye notes, it is clear that the letters were actually intended as a first step in the solicitation of that customer on behalf of K.P. The letters Donnelly and Scocca sent were identical and were typed

---

Loguercio Dep. at 11.) Kolosek testified that he and Perry were the sole owners of Kleen Pac Systems. (Kolosek Dep. at 4–5.)

The parties treat K.P. Laundry Machinery and Kleen Pac Systems as one entity for the purpose of this litigation.

and mailed by K.P. The letter advises the customer, "I will be stopping by within the week to say Hello and to thank you for all your past kindness." (Pltf's Record at 1336, 1337.)

■ It is undisputed that Donnelly and Scocca, shortly after joining K.P. and sending such letters, personally visited a number of accounts they had been servicing for Ecolab. On several occasions, Donnelly was accompanied on such visits by Dominick Loguercio, K.P.'s Executive Vice President in Charge of Sales. Although, according to his testimony, Donnelly he did not personally solicit the accounts, Loguercio did. Donnelly's presence as a new K.P. representative, together with Loguercio who solicited the customer for K.P., was unquestionably a part of K.P.'s solicitation. If this is not equivalent to solicitation, it certainly qualifies as assisting a competing firm in solicitation and thus violates the Ecolab employment agreement.

■ Although Scocca's job at K.P. does not generally require him to go out into the field, he has made five service calls on Ecolab accounts since joining K.P. (Scocca Dep. at 5–6.) Two of these accounts he had serviced within his last twelve months at Ecolab. (Scocca Dep. at 7.) On one of these occasions, Scocca arranged for an Ecolab dish machine to be replaced with a K.P. machine and arranged for the restaurant to purchase chemicals, in the future, from K.P. Although this business was apparently not "solicited," Scocca did violate his employment agreement with Ecolab by accepting "orders for any 'Competing Products'" from a customer he had serviced for Ecolab within his last year there. (Pltf's Record at 1317.) On the other occasion, at Loguercio's request, Scocca went to a restaurant he serviced during his last year at Ecolab and replaced Ecolab chemical dispensing equipment with K.P. equipment so that the customer could switch from Ecolab to K.P. chemicals. (Scocca Dep. at 12–14.)

Although the evidence is slightly less forceful, the plaintiff has demonstrated at least a "fair issue for litigation" as to whether the trade secrets provision was also breached. The evidence shows that when he left for K.P., Donnelly failed to return some sensitive and confidential information to Ecolab, although his contract explicitly required him to do so. Moreover, Loguercio testified that he discussed various Ecolab accounts with Donnelly and/or Scocca. (D. Loguercio Dep. at 224, 226, 235–36.) Loguercio later solicited these accounts. Other evidence suggests that passing of information was part of a planned pattern for misappropriating Ecolab trade secrets. One employee of Ecolab, who declined a job offer from K.P., asserts that when he expressed concern to Loguercio over his contractual commitment to Ecolab, Loguercio told him that he could pass the information concerning his Ecolab accounts to another employee of K.P., who in turn could solicit the accounts. (Graves Aff. at 2.)

### 2. Tortious Inducement to Breach

To prove tortious interference with a contract, a party must show that there was a valid contract, that the defendant knew of the contract, and that the defendant intentionally interfered with that contract, resulting in damage to the plaintiff. *Israel v. Wood Dolson Co., Inc.,* 1 N.Y.2d 116, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97, 99 (1956); *S & S Hotel Ventures Limited Partnership v. 777 S.H. Corp.,* 108 A.D.2d 351, 489 N.Y.S.2d 478, 480 (1st Dept.1985). Ecolab has shown that K.P.'s managerial employees knew of Ecolab's agreement with its employees, even if they did not know the exact language. (*See, e.g.,* Graves Aff. at 2; D. Loguercio Dep. at 188.)

The evidence strongly supports the plaintiff's claim that K.P. intentionally induced several employees to breach the contract. At least nineteen Ecolab employees were contacted by K.P. On numerous occasions, Ecolab employees were contacted at home by K.P. Employees, without previously having expressed any interest in joining K.P. At least two Ecolab employee were told that K.P. intended to hire twenty to twenty-five Ecolab employees. (Garfield Aff. at 2; Larsson Aff. at 2.) Several of the Ecolab employees solicited by K.P. testified that they were being requested to

bring their old accounts with them to K.P. One such employee was told that salespeople generally bring fifty-percent of their accounts with them when they leave their employer for a competitor. (Graves Aff. at 3.) Another employee testified that he was asked, "What percentage of Ecolab's accounts would you be able to bring in to justify the large salary we are offering you?" (Hittner Supp.Aff. at 3; *see also* Hittner Aff. at 2.) Several other employees assert that K.P. made clear to them, either explicitly or implicitly, that they were being offered a job under the expectation that they would bring their Ecolab accounts to K.P. (Bergenfeld Aff. at 2; Garfield Aff. at 2; Gerundo Aff. at 2; Graves Aff. at 2.)

K.P.'s awareness and its intentions are further shown by its indemnification of the former Ecolab employees who joined K.P. against liability for breaching the Ecolab employment agreement. Such indemnification was not generally offered as a benefit of employment at K.P. There can be little doubt that the indemnification agreements, as well as the large salaries, were offered to Ecolab employees to encourage them to breach their contractual obligation by soliciting their Ecolab customers for K.P.

### 3. *Defenses*

■ The first defense is that the restrictive covenants are void as against public policy. The defendants contend that New York law is applicable, but that even if Minnesota law applies, as specified in the employment agreements, *see Freedman v. Chemical Construction Corp.*, 43 N.Y.2d 260, 401 N.Y.S.2d 176, 179–80, 372 N.E.2d 12, 14–15 (1977); *Restatement (Second) of Conflict of Laws* § 187 (1971), the covenants are not enforceable. This defense is ineffectual. Even if the issue is judged under New York substantive law, these narrowly tailored covenants are enforceable; they do not violate the law or public policy.

New York law disfavors restrictive covenants which interfere with a person's ability to pursue a similar vocation after leaving employment with a particular firm. *American Broadcasting Cos. Inc. v. Wolf,*

52 N.Y.2d 394, 438 N.Y.S.2d 482, 487, 420 N.E.2d 363, 368 (1981), *quoting Purchasing Associates, Inc. v. Weitz*, 13 N.Y.2d 267, 246 N.Y.S.2d 600, 604, 196 N.E.2d 245, 247 (1963). A court will not enforce restrictive employment agreements unless they are "reasonably limited temporally and geographically," and are "necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists." *Columbia Ribbon & Carbon Mfg. Co., Inc. v. A–1–A Corp.*, 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 1006, 369 N.E.2d 4, 6 (1977).

There is little danger that enforcement of the Ecolab employment agreement will interfere with the former employees' ability to earn a livelihood in the sales of laundry and warewashing equipment and chemicals. As the defendants note, there are over 110,000 potential customers in the New York area. Barring these employees for one year from soliciting the handful of clients they serviced while at Ecolab would not be an unreasonable hardship. Furthermore, as required under New York law, the restrictive provisions are narrowly crafted. The covenants apply only to customers serviced by the particular employee within his last twelve months at Ecolab. Even as to those customers, the covenants restrict the employee for only twelve months after leaving Ecolab. The employees are not subjected to a geographical restriction. They may solicit business in direct competition with Ecolab in the same region they have previously worked. They are barred only from soliciting for a year the tiny fraction of the New York market that they *personally* solicited in their last year at Ecolab.

■ Under principles of law and public policy of New York or Minnesota, the restriction is not an unreasonable limitation on the salesman's ability to earn his living in his field of specialty; it does not unreasonably tie him to Ecolab by preventing him from working for competitors, and there is a substantial showing that the restriction is reasonably necessary to protect Ecolab's business. A salesman who

services an account necessarily becomes familiar with a great deal of confidential information about the relationship between seller and buyer, including the pricing and service being offered by the seller. In many instances the salesman is furnished with this information by his employer to enable him to service the account effectively. It is reasonable for the employer to provide by a reasonably narrow contract that the confidential information imparted to the salesmen, or developed by him for the benefit of his employer, will not pass to the competition together with the services of the employee.

Similarly, the goodwill of the salesman's relationship with the customer is to a degree an asset of the employer. In many instances the goodwill has been created by the employer and is passed on to the salesman by introductions and support. If it is developed by the salesman, that is done for the benefit of the employer under a duty of loyalty and in return for compensation paid to the salesman by the employer. These aspects of goodwill can be reasonably viewed as legitimate property interests of the employer which are entitled to contractual protection so long as the protective contracts are of reasonable scope. *American Broadcasting Cos., Inc. v. Wolf*, 52 N.Y.2d 394, 438 N.Y.S.2d 482, 486, 420 N.E.2d 363, 367 (1981); *cf. Walker Employment Services, Inc. v. Parkhurst*, 300 Minn. 264, 219 N.W.2d 437, 441 (1974), *quoting Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 134 N.W.2d 892, 899 (1965).

Overbroad covenants have been struck down when they unreasonably enslaved the employee, tying him to his employer by effectively barring him from earning his living in his field of expertise with a competitor. On the other hand, when the covenant reasonably protects what properly belongs to the employer without unduly restricting the salesman's opportunity to be employed in his field, it is a valid contract which is entitled to court protection. *American Broadcasting Cos. v. Wolf*, 433 N.Y.S.2d at 486–87, 420 N.E.2d at 367–68. The plaintiff has made a strong showing that the covenants are "necessary to protect the trade secrets, customer lists [and] goodwill of [Ecolab's] business," and that they are reasonable "in time, space [and] scope." *Id.* at 486, 420 N.E.2d at 367; *cf. Walker Employment Services, Inc. v. Parkhurst*, 219 N.W.2d at 441. It is likely that they will be enforced after a full trial on the merits.

█ The other defenses fail. The fact that the employment agreement with Ecolab was a condition of employment with Ecolab does not mean that those were coerced, unenforceable agreements. Presumably most large organizations have standardized employment contracts. There is no merit to the contention that the agreements were not supported by consideration, nor in the contention that an employee's change in job responsibilities and title at Ecolab affected the continued vitality of the agreement. Finally, K.P. raises the defense of unclean hands but has failed to show that there is any support for it.

### 4. Satisfaction of the Preliminary Injunction Standard

█ To prevail on a motion for a preliminary injunction in this Circuit, the moving party must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam). Ecolab has made a strong showing that defendants Donnelly and Scocca have violated the contract provisions and that K.P. has induced Donnelly, Scocca and other former employees of Ecolab to breach the employment agreement. The defenses raised by the defendant are unlikely to be successful.

Furthermore, Ecolab has demonstrated that it will suffer irreparable harm absent preliminary relief. There is a substantial showing that Ecolab can lose a great deal of business and profits if it is not accorded enforcement of its contractual covenant

with its employees. The extent of its loss may be very difficult to measure to the point that Ecolab might not be fairly compensated if left to a damage remedy. *See Danielson v. Local 275, Laborers Int'l Union of North America, AFL–CIO*, 479 F.2d 1033 (2d Cir.1973).

I conclude that Ecolab has shown entitlement on either branch of the *Jackson Dairy* test. In my opinion, in addition to irreparable harm, it has shown likelihood of success on the merits. Regardless whether it has shown likelihood of success, it has certainly satisfied the second branch of the test by showing a fair question for litigation and the balance of hardships tipping decidedly in its direction.

SO ORDERED.